IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
August 11, 2020 Session

**KERRY DAVIS v. GARRETTSON ELLIS, M.D.**

**Appeal from the Circuit Court for Shelby County
No. CT-002190-12   Rhynette N. Hurd, Judge**

_____

**No. W2019-01367-COA-R3-CV**

_____

This is a health care liability case. The trial court granted summary judgment in favor of Appellee/doctor finding that Appellant's expert witness failed to connect the decedent's death to Appellee's alleged deviation from the standard of care. We conclude that Appellant presented sufficient evidence, at the summary judgment stage, to create a dispute of fact concerning deviation from the standard of care and causation. Accordingly, we reverse the trial court's grant of summary judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Reversed in Part, Affirmed in Part, and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and ARNOLD B. GOLDIN, J., joined.

Gary K. Smith and C. Philip M. Campbell, Memphis, Tennessee, for the appellant, Kerry Davis.

Jennifer S. Harrison and James E. Looper, Memphis, Tennessee, for the appellee, Garrettson Ellis, M.D.

**OPINION**

**I. Background**

On January 18, 2011, 40-year-old Sylvia Davis was admitted to the emergency room at Methodist Hospital-Germantown complaining of a cough, fever, and shortness of breath. She was diagnosed with multilobar, community-acquired pneumonia and was admitted to a medical floor.

On the afternoon of January 19, 2011, at approximately 4:00 p.m., Dr. Garrettson Ellis ("Appellee"), the on-call intensivist,[1] performed a pulmonary consult. Dr. Ellis' notes indicated that Mrs. Davis was awake, alert, and oriented; however, her oxygen saturation level was 93% on a nonrebreather mask set to 100% oxygen.[2] Dr. Ellis noted that Mrs. Davis' respiratory condition had "progressively worsened over the past 24 hours." She "continued to be febrile and has become progressively more hypoxemic, requiring 100% nonrebreather." As such, Dr. Ellis opined that Mrs. Davis would likely "get worse before she [got] better," to-wit:

> I anticipate that her pulmonary status is going to continue to decline. Given her present course, she likely will need intubation and mechanical ventilation within the next 24 hours. She will be admitted to the intensive care unit [("ICU")] for close observation and intubation when needed.

Dr. Ellis did not order intubation at that time but referred Mrs. Davis to the ICU for observation. The January 19, 2011, 4:00 p.m. consult was the only time Dr. Ellis saw Mrs. Davis. Dr. Ellis' shift ended at 6:00 p.m., and he had no further contact with Mrs. Davis thereafter.

When Dr. Ellis' shift ended, Dr. Glen Williams replaced him as the on-call intensivist. Around 6:49 p.m., a respiratory therapist evaluated Mrs. Davis and reported her condition to Dr. Williams. At 7:30 p.m., Mrs. Davis' oxygen saturation level was 82%. At approximately 7:45 p.m., Dr. Williams ordered that Mrs. Davis be placed on a non-invasive, positive-pressure ventilation facemask.[3] For the next few hours, her oxygen saturation level fluctuated from 96%-100%. At approximately 10:00 p.m., Mrs. Davis' oxygen saturation level decreased to 89%. At 11:00 p.m., her oxygen level dropped to 74%; at that time, she was in acute respiratory distress and failure. Dr. Williams ordered intubation. Beginning at 11:09 p.m., the emergency room doctor attempted three unsuccessful intubations before calling for anesthesiology to assist. Mrs. Davis was successfully intubated by an anesthesiologist at 11:36 p.m. Unfortunately, on January 20, 2011, at approximately 5:23 a.m., Mrs. Davis coded. She was pronounced dead at 5:40 a.m.

---

[1] An intensivist is a physician who specializes in the care and treatment of patients in intensive care. An intensivist may also be referred to as a critical care specialist.

[2] A nonrebreather mask is a face mask that covers the nose and mouth, which can deliver a high concentration of oxygen to a patient. Aimee Eyvazzadeh, MD, *How Non-Rebreather Masks Work*, HEALTHLINE (Mar. 30, 2020), https://www.healthline.com/health/rebreather-mask#overview.

[3] Noninvasive positive-pressure ventilation is "a form of mechanical support in which positive pressure delivers a mixture of air and oxygen" via a standard ICU ventilator or a portable device. *Noninvasive Positive-Pressure Ventilation (NPPV) for Acute Respiratory Failure*, AGENCY FOR HEALTHCARE RESEARCH AND QUALITY (April 21, 2011), https://effectivehealthcare.ahrq.gov/products/nppv-respiratory-failure/research-protocol. It is an alternative to intubation. *Id.*

On May 16, 2012, Mrs. Davis' husband, Kerry Davis ("Appellant"), filed this health care liability action in the Shelby County Circuit Court ("trial court").[4] In his complaint, Appellant alleged, in relevant part:

15. [] [A]lthough Dr. Ellis noted the need for intensive care and specifically for intubation . . . no attempts were made to intubate Sylvia Davis at that time.

16. Instead, the intubation was deferred and not even attempted until several hours later, approximately one hour before midnight on January 20, 2011.

17. Because the medical condition of Sylvia Davis worsened because the endotracheal tube had not been placed, the process of intubating her once it was finally attempted became more difficult for the physician who attempted it, who noted by that time that she was "in obvious respiratory distress."

***

22. Because of the lengthy delay in the placement of an endotracheal tube in Sylvia Davis, the placement of which was medically indicated at or very near the time it was first noted to be likely necessary by Dr. Ellis, Sylvia Davis deteriorated and died, when, more probably than not, she would have survived and recovered had she been timely intubated.

23. But for the acts of negligence referred to in the preceding paragraphs, it is more probable than not that had Sylvia Davis been provided an endotracheal tube at or very shortly after the time Dr. Ellis had noted that she was likely going to need an endotracheal tube, her condition would not have been allowed to deteriorate to the point that she would require emergency resuscitation. It is also more likely than not that had she not been allowed to deteriorate to the point that her condition became a medical emergency, efforts to place an endotracheal tube would not have failed, and Sylvia Davis would not have died an untimely death at the age of 40.

In his July 24, 2012 answer, Dr. Ellis denied liability.[5]

On November 30, 2018, Appellant identified Dr. Kyle Gunnerson as an expert witness. On February 12, 2019, Dr. Ellis deposed Dr. Gunnerson as an adverse expert

---

[4] Mr. Davis sued Dr. Ellis, Mid-South Pulmonary Specialists, P.C., Methodist Healthcare-Memphis Hospitals, and Methodist Hospital of Germantown. Defendants Methodist Healthcare-Memphis Hospitals, Methodist Hospital Germantown, and Mid-South Pulmonary Specialists, P.C. were dismissed, and Dr. Ellis is the sole remaining defendant.

[5] Concurrent with his answer, Dr. Ellis filed a Tennessee Rule of Civil Procedure 12.02 motion to dismiss, which the trial court denied.

- 3 -

witness; Mr. Davis' counsel posed no questions to Dr. Gunnerson during this discovery deposition.

On March 29, 2019, Dr. Ellis moved for summary judgment. As grounds for his motion, Dr. Ellis asserted:

1. There is no causal connection between any alleged negligence by Dr. Ellis and any injury, including death, to Ms. Davis; and
2. If cause-in-fact is established, a superseding, intervening cause relieves Dr. Ellis of liability.

\*\*\*

Summary judgment is appropriate in this matter because the undisputed facts show that [Appellant], by way of his only medical expert, has not established a causal connection necessary to prove his case. Additionally, and in the alternative, even if [Appellant] were to establish cause-in fact, Dr. Ellis is not liable because the three failed intubations of Ms. Davis constitute a superseding, intervening cause.

On May 14, 2019, Appellant filed a response in opposition to the motion for summary judgment along with Dr. Gunnerson's affidavit. Dr. Ellis moved to strike Dr. Gunnerson's affidavit. In its July 3, 2019 order granting Dr. Ellis' motion for summary judgment, the trial court denied his motion to strike Dr. Gunnerson's affidavit on its finding that "the Affidavit, even if considered, does not remedy the deficiencies in [Dr. Gunnerson's] expert proof." In concluding that Dr. Ellis was entitled to summary judgment, the trial court analyzed his deposition testimony and affidavit:

Dr. Gunnerson is unequivocal that [Dr. Ellis] deviated from the standard of care not because he failed to intubate Mrs. Davis but because, in Dr. Gunnerson's opinion, [he] failed to have a plan to address Mrs. Davis' condition. . . . Careful reading of Dr. Gunnerson's deposition reveals that Dr. Gunnerson does not opine [that Dr. Ellis] deviated from the standard of care by not intubating Mrs. Davis but rather by not documenting or having a conversation with other providers for a patient "who will require intubation at some time." At no time during his deposition did Dr. Gunnerson say [that Dr. Ellis'] failure to intubate Mrs. Davis or [Dr. Ellis'] failure to have a plan more likely than not caused Mrs. Davis' injury. . . . Without any explanation for his changed opinion and with no additional knowledge . . . Dr. Gunnerson's Affidavit presents an entirely different assessment of [Dr. Ellis'] treatment of Mrs. Davis. Unlike the deposition testimony, the Affidavit emphasizes the question of untimely intubation.

- 4 -

Based, in part, on the alleged discrepancy between Dr. Gunnerson's deposition testimony and affidavit, the trial court concluded:

> According to the Affidavit, [Dr. Ellis'] failure to intubate caused the harm, but, according to Dr. Gunnerson, [Dr. Ellis] did not deviate from the standard of care by not intubating Mrs. Davis during the time he saw her. Without expert proof connecting the alleged deviation to the cause of harm to [Mrs. Davis], there is no genuine issue for trial, and [Dr. Ellis] is entitled to summary judgment. [Dr. Ellis] has demonstrated [that Appellant's] evidence at this stage of the litigation is insufficient to establish [Appellant's] claim, and neither the Affidavit nor any other evidence [Appellant] has presented demonstrates the existence of a genuine issue for trial.

Having determined that Appellant failed to meet his burden to show, at the summary judgment stage, that Dr. Ellis' failure to intubate or failure to put in place a plan for Mrs. Davis' treatment caused her death, the trial court did not address Dr. Ellis' alternate ground for summary judgment concerning whether other providers' subsequent treatment of Mrs. Davis constituted a superseding/intervening cause that would negate Dr. Ellis' liability. Appellant appeals.

## II. Issue

The sole issue for review is whether the trial court erred in granting Dr. Ellis' motion for summary judgment.

## III. Standard of Review

A trial court's decision to grant a motion for summary judgment presents a question of law. Therefore, our review is *de novo* with no presumption of correctness afforded to the trial court's determination. ***Bain v. Wells***, 936 S.W.2d 618, 622 (Tenn. 1997). This Court must make a fresh determination that all requirements of Tennessee Rule of Civil Procedure 56 have been satisfied. ***Abshure v. Methodist Healthcare-Memphis Hosps.***, 325 S.W.3d 98, 103 (Tenn. 2010). When a motion for summary judgment is made, the moving party has the burden of showing that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Tenn. R. Civ. P. 56.04. "A fact is material 'if it must be decided in order to resolve the substantive claim or defense at which the motion is directed.'" ***Akers v. Heritage Med. Assocs., P.C.***, No. M2017-02470-COA-R3-CV, 2019 WL 104130, at *5 (Tenn. Ct. App. Jan. 4, 2019), *perm. app. denied* (Tenn. May 16, 2019) (quoting ***Byrd v. Hall***, 847 S.W.2d 208, 215 (Tenn. 1993)). Further, "[a] 'genuine issue' exists if 'a reasonable jury could legitimately resolve that fact in favor of one side or the other.'" ***Akers***, 2019 WL 104130, at *5 (quoting ***Byrd***, 847 S.W.2d at 215).

The Tennessee Supreme Court has explained that when the party moving for summary judgment does not bear the burden of proof at trial, "the moving party may satisfy its burden of production either: (1) by affirmatively negating an essential element of the nonmoving party's claim, or (2) by demonstrating that the nonmoving party's evidence at the summary judgment stage is insufficient to establish the nonmoving party's claim or defense." *Rye v. Women's Care Center of Memphis, MPLLC*, 477 S.W.3d 235, 265 (Tenn. 2015) (italics omitted). Furthermore,

> "[w]hen a motion for summary judgment is made [and] . . . supported as provided in [Tennessee Rule 56]," to survive summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading," but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, "set forth specific facts" at the summary judgment stage "showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.,* [*Ltd. v. Zenith Radio Corp*.], 475 U.S. [574,] 586, 106 S. Ct. 1348 [(1986)]. The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party.

*Rye*, 477 S.W.3d at 265. "Upon review, this Court considers 'the evidence in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor.'" *Ray v. Neff*, No. M2016-02217-COA-R3-CV, 2018 WL 3493158, at *3 (Tenn. Ct. App. July 20, 2018) (quoting *McCullough v. Vaughn*, 538 S.W.3d 501, 505 (Tenn. Ct. App. 2017) (citing *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002))); *see also Stovall v. Clarke*, 113 S.W.3d 715, 721 (Tenn. 2003) (citing *Webber v. State Farm Mut. Auto. Ins. Co.*, 49 S.W.3d 265, 269 (Tenn. 2001)). The trial court may grant summary judgment only if "'both the facts and the conclusions to be drawn from the facts permit a reasonable person to reach only one conclusion.'" *Helderman v. Smolin*, 179 S.W.3d 493, 500 (Tenn. Ct. App. 2005) (quoting *Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1995)).

## IV. Analysis

Appellant's burden of proof in this health care liability case is governed by Tennessee Code Annotated section 29-26-115(a), which provides, in relevant part:

(a) . . . the claimant shall have the burden of proving by evidence as provided by subsection (b):

(1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant

practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;

(2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

Tenn. Code Ann. § 29-26-115(a).  The statute further provides that:

(b) No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a), unless the person was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make the person's expert testimony relevant to the issues in the case and had practiced this profession or specialty in one (1) of these states during the year preceding the date that the alleged injury or wrongful act occurred. This rule shall apply to expert witnesses testifying for the defendant as rebuttal witnesses. The court may waive this subsection (b) when it determines that the appropriate witnesses otherwise would not be available.

Accordingly, "the evidence required by section 29-26-115(a) must be proven through the testimony of a qualified expert witness." *Young v. Frist Cardiology, PLLC*, 599 S.W.3d 568, 571 (Tenn. 2020) (citing *Shipley v. Williams*, 350 S.W.3d 527, 550 (Tenn. 2011) (citing Tenn. Code Ann. § 29-26-115(a); *Williams v. Baptist Mem'l Hosp.*, 193 S.W.3d 545, 553 (Tenn. 2006); *Robinson v. LeCorps*, 83 S.W.3d 718, 724 (Tenn. 2002))).  So, here, we are concerned with whether Dr. Gunnerson's deposition testimony or affidavit creates at least a dispute of fact concerning: (1) the applicable standard of care; (2) whether Dr. Ellis deviated from the standard of care, and/or (3) whether Dr. Ellis' deviation from the standard of care caused Mrs. Davis' death.  Before addressing this question, we briefly discuss the trial court's treatment of Dr. Gunnerson's affidavit.

As noted above, Dr. Ellis moved to strike Dr. Gunnerson's affidavit, which Appellant filed in opposition to Dr. Ellis' motion for summary judgment.  Specifically, Dr. Ellis alleged that Dr. Gunnerson changed his opinions only after reviewing Dr. Ellis' motion for summary judgment, thus, he argued that the affidavit was a "sham affidavit."  At the summary judgment hearing, the trial court stated that it was going to "disallow" the affidavit; however, in its July 3, 2019 order, the trial court denied the motion to strike the

affidavit. It is well-settled that a trial court speaks through its orders. ***Palmer v. Palmer***, 562 S.W.2d 833, 837 (Tenn. Ct. App. 1977). "A judgment must be reduced to writing in order to be valid. It is inchoate, and has no force whatever, until it has been reduced to writing and entered on the minutes of the court." ***Cunningham v. Cunningham***, No. W2006-02685-COA-R3-CV, 2008 WL 2521425, *5 (Tenn. Ct. App. June 25, 2008). Based on the trial court's statements in its order, it did consider Dr. Gunnerson's affidavit but found it of no effect, i.e., "the Affidavit, even if considered, does not remedy the deficiencies in [Dr. Gunnerson's] expert proof." We will discuss the effect of Dr. Gunnerson's affidavit on Appellant's burden of proof below. However, as an initial matter, we conclude that it was not error for the trial court to consider Dr. Gunnerson's affidavit in addition to his deposition testimony. Tennessee Rule of Civil Procedure 56.06 specifically allows affidavits in response to motions for summary judgment to "set forth specific facts showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06; *see also* ***Rye***, 477 S.W.3d at 250, 262, 265; ***Foltz v. Barnhart Crane & Rigging Co.***, No. W2018-02198-COA-R3-CV, 2019 WL 6842375, at *3 (Tenn. Ct. App. Dec. 16, 2019); ***Miller v. TRH Health Ins. Co.***, No. E2017-02049-COA-R3-CV, 2019 WL 4861555, at *2 (Tenn. Ct. App. Oct. 2, 2019); ***Lexon Ins. Co. v. Windhaven Shores, Inc.***, 601 S.W.3d 332, 338 (Tenn. Ct. App. 2019). Accordingly, we affirm the trial court's denial of Dr. Ellis' motion to strike Dr. Gunnerson's affidavit. We now turn to the substantive question of whether the trial court erred in granting Dr. Ellis' motion for summary judgment.

## A. Deviation from the Standard of Care

Concerning the first and second *prima facie* elements in this health care liability action, i.e., the standard of care and whether Dr. Ellis deviated from it, the trial court found:

> During his deposition, Dr. Gunnerson stated . . . that he agreed with [Dr. Ellis'] assessment that Mrs. Davis would "most likely need intubation sometime in the future" . . . , but he disagreed with transferring Mrs. Davis to ICU with "no plan laid out in the chart or in the . . . communication with his oncoming intensivist partner for the night as far as specific steps to be taken in regards to Mrs. Davis's respiratory status." . . . .

> When asked at what point a patient in Mrs. Davis' condition should be intubated, Dr. Gunnerson said, "[I]n a standard of care, 24 hours would be, you know, would be too late." He went on to say that if a patient needed to go to ICU immediately, "then either intubating her or making a plan for doing this promptly, sooner [rather] than later, is necessary." . . . . Dr. Gunnerson explained the intensivist has options, including immediate intubation or trial noninvasive procedures, but the standard of care requires that there be a treatment plan.

> Dr. Gunnerson stated that the standard of care did not require [Dr. Ellis] to intubate Mrs. Davis when he saw her at 4:00 pm. . . . He also opined there was more than one way of addressing Mrs. Davis' condition. . . . Dr. Gunnerson is unequivocal that [Dr. Ellis] deviated from the standard of care not because he failed to intubate Mrs. Davis but because, in Dr. Gunnerson's opinion, Defendant failed to have a plan to address Mrs. Davis' condition. . . . Careful reading of Dr. Gunnerson's deposition reveals that Dr. Gunnerson does not opine Defendant deviated from the standard of care by not intubating Mrs. Davis but rather by not documenting or having a conversation with other providers for a patient "who will require intubation at some time." . . . .

Reading Dr. Gunnerson's affidavit in the light most favorable to Appellant (as we must do at the summary judgment stage), we disagree with the trial court's conclusions that "Dr. Gunnerson does not opine [that Dr. Ellis] deviated from the standard of care by not intubating Mrs. Davis but rather by not documenting or having a conversation with other providers for a patient 'who will require intubation at some time.'" As discussed above, in the span of approximately 24 hours, Mrs. Davis' condition rapidly deteriorated, and she was at risk for "impending respiratory failure." As set out in the notations Dr. Ellis made on Mrs. Davis' medical chart, he recognized that her respiratory condition was declining and that she was at risk for "impending respiratory failure." In his deposition, Dr. Gunnerson explained that because Mrs. Davis' condition was rapidly declining, the standard of care required Dr. Ellis to intervene and implement a treatment plan that would stabilize her respiratory condition. He opined that this type of foresight and anticipation is what differentiates an intensivist from a doctor who does not perform critical care. It is "that anticipation that something bad is going to happen, and using clinical judgment [that] has been honed over the years to interact to prevent that badness from happening . . . ." According to Dr. Gunnerson, Dr. Ellis' plan to send Mrs. Davis to the ICU for monitoring did not satisfy the standard of care because "a plan just to watch her is not a plan to reverse or to treat or to support her respiratory status." Dr. Gunnerson opined that, at the time Dr. Ellis was treating Mrs. Davis, she had "nowhere left to go [in terms of treatment of her respiratory decline] other than [a] mechanical type of positive pressure." As such, Dr. Gunnerson surmised that Dr. Ellis' wait and see approach was not a sufficient plan of care and, thus, constituted a deviation from the standard of care. In furtherance of his opinion that Dr. Ellis took the wrong approach in Mrs. Davis' case, Dr. Gunnerson explained that Dr. Ellis had several options that would have satisfied the standard of care. Dr. Gunnerson opined that Dr. Ellis could have attempted a noninvasive treatment through a positive-pressure ventilation facemask; however, he conceded that this treatment option likely would have been unsuccessful given Mrs. Davis' rapidly declining respiratory condition. In that case, Dr. Gunnerson opined that

the standard of care would dictate intubation, to-wit:

> Q. . . . Any other opinions against Dr. Ellis, I want to be clear, he had two choices when he was at the bedside, he should have -- or **the standard of care, required him to electively intubate or do a noninvasive brief trial**, monitored the patient's outcome, which we both agree could or could not have been good or bad?

> A. **Correct**.

(emphases added). In his affidavit, Dr. Gunnerson reiterated this point, stating that, "It would have been reasonable under the standard of care applicable to Dr. Ellis as an intensivist to have attempted a brief trial of noninvasive positive pressure ventilation, but also to have been prepared to perform the intubation promptly . . . ." In lieu of attempting either of these treatments himself, Dr. Gunnerson opined that Dr. Ellis could have met the standard of care by instructing other providers to perform these treatments imminently. Rather, Dr. Ellis left the hospital on January 19, 2011, leaving Mrs. Davis without necessary treatment or a clear plan for immediate treatment. In this regard, Dr. Gunnerson's deposition and affidavit create a dispute of fact as to whether Dr. Ellis, while recognizing that Mrs. Davis was in immediate danger of losing her airway, ostensibly abandoned her by failing to provide necessary treatment before ending his shift. A close reading of Dr. Gunnerson's deposition and affidavit indicates that the lack of any intervention on Dr. Ellis' part forms the basis of Dr. Gunnerson's opinion that Dr. Ellis deviated from the standard of care.

## B. Causation

Concerning the *prima facie* element of causation, "a plaintiff in a [health care liability] case in Tennessee 'must prove **that it is more likely than not** that the defendant's negligence caused plaintiff to suffer injuries which would have not otherwise occurred.'" ***Kilpatrick v. Bryant***, 868 S.W.2d 594, 602 (Tenn. 1993) (emphasis added) (quoting ***Boburka v. Adcock***, 979 F.2d 424, 429 (6th Cir. 1992)). Specifically, the ***Kilpatrick*** Court explained that

> **the plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result**. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant . . . .

> The plaintiff is not, however, required to prove the case

- 10 -

beyond a reasonable doubt. The plaintiff need not negative entirely the possibility that the defendant's conduct was not a cause and **it is enough to introduce evidence from which reasonable persons may conclude that it is more probable that the event was caused by the defendant than that it was not** . . . . (Citation omitted). A doctor's testimony that a certain thing is possible is no evidence at all. His opinion as to what is possible is no more valid than the jury's own speculation as to what is or is not possible. Almost anything is possible, and it is thus improper to allow a jury to consider and base a verdict upon a 'possible' cause of death. (Citation omitted). The mere possibility of a causal relationship, without more, is insufficient . . . .

> *Lindsey*, 689 S.W.2d 856, 861-62. Thus, proof of causation equating to a "possibility," a "might have," "may have," "could have," is not sufficient, as a matter of law, to establish the required nexus between the plaintiff's injury and the defendant's tortious conduct by a preponderance of the evidence in a medical malpractice case. **Causation in fact is a matter of probability, not possibility, and in a medical malpractice case, such must be shown to a reasonable degree of medical certainty**. *White v. Methodist Hosp. South*, 844 S.W.2d 642, 648-49 (Tenn. [Ct.] App. 1992).

*Kilpatrick*, 868 S.W.2d at 602 (emphases added) (quoting *Lindsey v. Miami Dev. Corp.*, 689 S.W.2d 856, 861-62 (Tenn. 1985)).

Throughout these proceedings, Dr. Ellis has maintained that Dr. Gunnerson's deposition and affidavit fail to show, to a reasonable degree of medical certainty, that Dr. Ellis' alleged deviation from the standard of care caused Mrs. Davis' death. Rather, Dr. Ellis contends that any opinion concerning a causal link between Dr. Ellis' actions and Mrs. Davis' death was purely speculative and, thus, insufficient to establish causation. *See Bara v. Clarksville Mem'l Health Sys., Inc.*, 104 S.W.3d 1, 10 (Tenn. Ct. App. 2002) ("[I]f a doctor cannot testify as to cause in fact to a reasonable degree of medical certainty, his testimony is not admissible before the jury and if there is no other expert evidence of causation in fact in a medical malpractice case, summary judgment would be proper."). Case law provides that "proof of causation equating to a 'possibility,' a 'might have,' 'may have,' 'could have,' is not sufficient, as a matter of law, to establish the required nexus between the plaintiff's injury and the defendant's tortious conduct by a preponderance of the evidence in a [health care liability] case." *Kilpatrick*, 868 S.W.2d at 602.

- 11 -

In granting Dr. Ellis' motion for summary judgment, the trial court found that

> [a]t no time during his deposition did Dr. Gunnerson say [that Dr. Ellis'] failure to intubate Mrs. Davis or [his] failure to have a plan more likely than not caused Mrs. Davis' injury.

While it is true that Dr. Gunnerson does not opine, in his deposition, that Dr. Ellis' failure to adhere to the standard of care caused Mrs. Davis' death, he was never asked this question. In fact, Appellant's attorney did not pose any questions to Dr. Gunnerson during his discovery deposition. Regardless, in his affidavit (which Appellant properly submitted to refute Dr. Ellis' claim for summary judgment), Dr. Gunnerson states:

> In my deposition I was not asked whether I hold the opinion to a reasonable degree of medical certainty that a deviation from the standard of care in this case more likely than not caused any injury, including the death of Sylvia Davis, which would not otherwise have occurred. I do hold that opinion. To a reasonable degree of medical certainty, had Sylvia Davis been timely intubated on the afternoon or early evening of January 19, 2011, before her condition deteriorated to the point that intubation had to be done as an emergency, it is medically probable that Sylvia Davis would not have died in January of 2011.

Dr. Gunnerson's affidavit statement is not supposition. It is a definitive statement, to a reasonable degree of medical certainty, that Dr. Ellis' failure to implement a treatment plan for Mrs. Davis more likely than not led to her death. In this regard, Dr. Gunnerson's affidavit creates a dispute of fact concerning whether Dr. Ellis' deviation from the standard of care caused Mrs. Davis death.

We concede that, in his deposition, Dr. Gunnerson occasionally used the word "speculation." In his affidavit, however, Dr. Gunnerson explained that he "did not mean to convey the impression that all of [his] opinions [were] based upon speculation." Indeed, when examined in context of the entire deposition, it is clear that Dr. Gunnerson's "speculation" concerned whether Dr. Ellis' trial of noninvasive treatment earlier in the day would have been successful in stabilizing Mrs. Davis' respiratory condition. As Dr. Gunnerson explained in his affidavit:

> 5. . . . My discussion of certain things being subject to "speculation" is confined primarily to the issue of alternative care measures that Dr. Ellis could have undertaken instead of timely intubation, specifically a trial of noninvasive positive pressure ventilation first as an alternative to intubation in order to attempt to avoid the more invasive care measure of intubation. Such a trial did not take actually place when Dr. Ellis was caring for Sylvia Davis. For that reason, I refer to it as a "hypothetical" trial.

Dr. Gunnerson also "speculated" concerning whether noninvasive treatment would have been successful in Mrs. Davis' case. Specifically, in his deposition, Dr. Gunnerson stated "that noninvasive positive pressure ventilation usually do[es] not work" in patients with multilobar pneumonia or severe pneumonia because the pneumonia is "not easily reversible." Thus, Dr. Gunnerson opined that Mrs. Davis likely would have not responded to the noninvasive positive pressure ventilation "considering how sick she was." However, Dr. Gunnerson explained that it would have been reasonable and within the applicable standard of care for Dr. Ellis to try the noninvasive treatment before proceeding to intubation. As explained in his affidavit:

> 6. I was asked many questions with the word "speculation" or "speculate," the vast majority of which were addressed to a trial of noninvasive positive pressure ventilation which Dr. Ellis did not actually undertake. **Ultimately, it is my opinion, as I indicated at pages 148 and 149 of my deposition, that it is medically probable that the alternative measure of noninvasive positive pressure ventilation, had Dr. Ellis attempted such a trial when he first saw Sylvia Davis, actually would not have been successful; therefore it is at least speculative to say that it would have been successful. My testimony in my deposition on this issue was that noninvasive positive pressure ventilation was not "going to avoid intubation at all."**

(emphasis added).

Dr. Ellis' argument that "[t]here is no proof that, if Dr. Ellis had attempted to sedate, intubate and mechanically ventilate the patient, the outcome would have been any different," and Dr. Ellis' assertion that "Dr. Gunnerson agreed that what happened with [the ER doctor] after 11:00 p.m. could have happened to Dr. Ellis at 4:00 p.m." are both based, in part, on certain portions of Dr. Gunnerson's testimony that are taken out of context. For example, Dr. Ellis cites the following passages from Dr. Gunnerson's deposition:

> Q: How do you know that if Dr. Ellis attempted to [sic] sedation, intubation and mechanical ventilation when he was at the beside [sic] earlier in the afternoon he would not have encountered the same difficulty?
>
> A: **Oh, <u>we</u> <u>don't</u> <u>know</u>.**

*** 

- 13 -

Q: But the same scenario could have unfolded earlier in the afternoon same as it unfolded later in the evening, replace [the ER doctor] with Dr. Ellis earlier in the afternoon. That could have happened?

A: **Yes**.

(emphases supplied by Dr. Ellis). However, when viewed in full context, Dr. Gunnerson's testimony evinces his actual opinion, to-wit:

Q: How do you know that if Dr. Ellis attempted to [sic] sedation, intubation and mechanical ventilation when he was at the beside [sic] earlier in the afternoon he would not have encountered the same difficulty?

A: Oh, we don't know. However, we do know that anesthesia was able to intubate after the first pass. At least that's what it -- what it implied in the note. . . . I did not see an anesthesia note that said it was a difficult airway from the anesthesia's standpoint. [The ER doctor] had a problem with it. Dr. Ellis may not have had any problems at all. Matter of fact, at this time, you know, Dr. Ellis may be a better intubator than [the ER doctor], I have no idea what [the ER doctor]'s experiences were. Dr. Ellis described in his deposition that he's intubated patients, you know, and he would actually intubate this patient.

**If the patient was able to have an oxygen starting point at 93 percent on 100 percent, that's a higher starting point than I think when [the ER doctor] came up there at 70 percent. So just from the beginning, the patient had a higher level of oxygen. So if there was difficulty, there was a little bit more reserve that could have provided some more time, patient wouldn't have been as dire straights as what happened later in the evening, so airways can change as the day goes on, too.**

The patient had a longer time to breathe faster, get more fluids. The airway could have become more edematous. Who knows. We didn't compare the airways before and after. So it may not have been a problem and Dr. Ellis may actually have been a better intubator than [the ER doctor], so --

\*\*\*

- 14 -

Q But the same scenario could have unfolded earlier in the afternoon same as it unfolded later in the evening, replace [the ER doctor] with Dr. Ellis earlier in the afternoon. That could have happened?

A Yes. **And at that time you would have Dr. Ellis who was at the bedside providing the -- the care and would be able to then use either bag mouth – bag mask valve -- bag valve mask, could have called for help with anesthesia, another attending could have come up and could have helped at that time, while the patient starting off with a saturation of 93 percent instead of 74 percent would have had a little bit better starting point.** Again, it's not good, because she's very sick, but **[she] would have had a better starting point than when the respiratory arrest happened later that evening to where it was called up when the sats were markedly lower** than that. So the starting point is markedly lower, and the margin of error is . . . so narrow, so close, that you just didn't have that, you know, that time.

(emphases added). Dr. Gunnerson's deposition testimony does not differ materially from his affidavit. He has consistently maintained that if Dr. Ellis had followed the standard of care by immediately implementing a plan to address Mrs. Davis' declining respiratory condition, one of two things would have more likely than not occurred. Either the noninvasive approach would have avoided intubation, or, failing that, intubation could have been achieved on a non-emergency basis before Mrs. Davis was in full respiratory arrest. According to Dr. Gunnerson, such actions would likely have saved Mrs. Davis' life. In his deposition, Dr. Gunnerson specifically explained that if Dr. Ellis had adhered to the standard of care, he would have attempted the noninvasive procedure (or instructed others to do so) between 4:00 p.m. and 5:00 p.m., when Mrs. Davis' oxygen saturation level was at 93%. Within two hours, it would have been clear whether the noninvasive treatment was working. If, as Dr. Gunnerson speculated, the noninvasive approach proved unsuccessful, Mrs. Davis could have undergone non-emergency intubation by 7:00 p.m. Dr. Gunnerson explained that, with timely treatment, Mrs. Davis' chance of death was 25-40%. Stated differently, had Dr. Ellis complied with the standard of care and provided timely treatment to stabilize Mrs. Davis' failing respiratory condition, she would have had a 60-75% probability of survival. Instead, Dr. Gunnerson opined that Dr. Ellis' "wait and see" approach cost Mrs. Davis critical time and resulted in further decline of her respiratory status, which ultimately led to her death. Specifically, Dr. Gunnerson explained that Dr. Ellis' inaction resulted in Mrs. Davis starting the noninvasive treatment at 7:45 p.m., when her oxygen saturation level had dropped to 82%, as opposed to starting the treatment between 4:00 p.m. (when Dr. Ellis first evaluated Mrs. Davis) and 6:00 p.m. (when Dr. Ellis' shift ended), when her oxygen saturation level was approximately 93%. According to Dr. Gunnerson, earlier treatment would have prevented Mrs. Davis from becoming more hypoxemic and bradycardic and

from falling into respiratory distress.[6]

While the noninvasive treatment, which was started at 7:45 p.m., initially improved Mrs. Davis' oxygen saturation levels to 96%-100%, the improvement was temporary. By 10:00 p.m., despite receiving constant oxygen through noninvasive means, Mrs. Davis' oxygen level had decreased to 89%. At 11:00 p.m., her oxygen saturation level had fallen to 74%, which, according to Dr. Gunnerson, caused her respiratory arrest. Dr. Williams then ordered intubation on an emergency basis; however, by this time, Mrs. Davis had been deprived of sufficient oxygen for such a period of time that it was too late to save her life. In none of his statements did Dr. Gunnerson deviate from his opinion that Dr. Ellis' failure to act within the applicable standard of care more likely than not resulted in Mrs. Davis' death. *Kilpatrick*, 868 S.W.2d at 602. In short, according to Dr. Gunnerson's testimony, it is more probable than not that Dr. Ellis' failure to adhere to the standard of care caused Mrs. Davis' death. *Id.* (quoting *Lindsey*, 689 S.W.2d at 861-62). In this regard, Dr. Gunnerson's deposition and affidavit are sufficient to create a dispute of material fact concerning whether Dr. Ellis' actions (or inaction) caused Mrs. Davis' death.

From Dr. Gunnerson's deposition and affidavit, Appellant has provided sufficient evidence to create a dispute of material fact concerning whether Dr. Ellis deviated from the standard of care and, if so, whether his error caused Mrs. Davis' death. *See Rye*, 477 S.W.3d at 265. Viewing Dr. Gunnerson's statements in the light most favorable to Appellant, we conclude that there are unresolved issues of material fact that preclude summary judgment. *See Ray*, 2018 WL 3493158, at *3 (quoting *McCullough*, 538 S.W.3d at 505 (citing *Godfrey*, 90 S.W.3d at 695)); *see also Stovall*, 113 S.W.3d at 721 (citing *Webber*, 49 S.W.3d at 269).

### C. Intervening/Superseding Cause

Before concluding, we briefly address Dr. Ellis' alternative ground for summary judgment, i.e., that the three failed attempts to intubate Mrs. Davis constituted a superseding/intervening cause, which relieved him of liability. As noted above, although Dr. Ellis averred this ground in his motion for summary judgment, based on its conclusion that Appellant failed to meet the *prima facie* burden to show a causal connection between Dr. Ellis' alleged deviation from the standard of care and Mrs. Davis' death, the trial court never addressed intervening/superseding causation.

---

[6] Hypoxemia occurs when a person has low levels of oxygen in her blood. Jill Seladi-Schulman, Ph.D., *What Is Hypoxemia?*, HEALTHLINE (May 17, 2019), https://www.healthline.com/health/hypoxemia. "Bradycardia is a slower than normal heart rate" and "can be a serious problem if the heart doesn't pump enough oxygen-rich blood to the body." *Bradycardia*, MAYOCLINIC, https://www.mayoclinic.org/diseases-conditions/bradycardia/symptoms-causes/syc-20355474#:~:text=Overview,than%2060%20times%20a%20minute (last visited Sept. 9, 2020).

The Tennessee Supreme Court has explained that "an independent intervening cause breaks the chain of proximate causation and thereby precludes recovery." *White v. Lawrence*, 975 S.W.2d 525, 529 (Tenn. 1998). However, if the intervening act is a "normal response created by negligence," which "could have reasonably been foreseen[,] and the conduct [of the original wrongdoer] was a substantial factor in bringing about the harm," the act is not a superseding/intervening cause, and the original wrongdoer is not relieved of liability. *Id.* (quoting *McClenahan v. Cooley*, 806 S.W.2d 767, 775 (Tenn. 1991)); *see also McClung v. Delta Square Ltd. P'ship*, 937 S.W.2d 891, 905 (Tenn. 1996); *Haynes v. Hamilton County*, 883 S.W.2d 606, 612 (Tenn. 1994). In summary, in relying on a superseding/intervening cause to negate his liability, a party must show that:

> (1) the harmful effects of the superseding cause must have occurred after the original negligence; (2) the superseding cause must not have been brought about by the original negligence; (3) the superseding cause must actively work to bring about a result which would not have followed from the original negligence; and (4) the superseding cause must not have been reasonably foreseen by the original negligent party. *Godbee v. Dimick*, 213 S.W.3d 865, 882 (Tenn. Ct. App. 2006).

*White v. Premier Med. Grp.*, 254 S.W.3d 411, 417 (Tenn. Ct. App. 2007); *see also Cotten v. Wilson*, 576 S.W.3d 626, 639 (Tenn. 2019) (citations omitted); *Borne v. Celadon Trucking Servs., Inc.*, 532 S.W.3d 274, 299 (Tenn. 2017) (quoting *White*, 254 S.W.3d at 417). Usually, the question of "[w]hether . . . an act or event constitutes an intervening cause is for the jury to determine unless the uncontroverted facts and inferences to be drawn from the facts make it so clear that all reasonable persons must agree on the proper outcome." *White*, 975 S.W.2d at 529-30 (citing *McClung*, 937 S.W.2d at 905); *see also Evridge v. Am. Honda Motor Co.*, 685 S.W.2d 632, 635 (Tenn. 1985) (citing *Wyatt v. Winnebago Industries, Inc.*, 566 S.W.2d 276, 281 (Tenn. App. 1977)) ("The issue of proximate or intervening cause is one for the jury to decide, unless the uncontroverted facts and the inferences to be drawn from them make it so clear that all reasonable men must agree on the outcome."). Here, Dr. Gunnerson's testimony creates a genuine issue of material fact concerning: (1) whether the superseding emergency intubations were brought about by Dr. Ellis' original negligence in failing to adhere to the standard of care; and (2) whether the superseding intubations caused Mrs. Davis' death, which would not have otherwise followed from Dr. Ellis' original negligence. *White*, 254 S.W.3d at 417 (citing *Godbee*, 213 SW.3d at 882). Accordingly, superseding/intervening causation is not a ground for summary judgment under the facts presented here.

- 17 -

## V.  Conclusion

For the foregoing reasons, we reverse the trial court's grant of Dr. Ellis' motion for summary judgment.  The trial court's order is otherwise affirmed, and the case is remanded for such further proceedings as may be necessary and are consistent with this opinion.  Costs of the appeal are assessed to the Appellee, Garrettson Ellis, M.D., for all of which execution may issue if necessary.

_____
KENNY ARMSTRONG, JUDGE